**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Antoinette Miller, | No. CV-24-08034-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Office of Navajo and Hopi Indian Relocation, | |
| Defendant. | |

Antoinette Miller ("Plaintiff") seeks judicial review of an administrative decision by the Office of Navajo and Hopi Indian Relocation ("ONHIR") denying her application for relocation benefits under the Navajo-Hopi Settlement Act ("the Settlement Act"). (Doc. 1.) Pending before the Court are Plaintiff's motion for summary judgment (Doc. 22) and ONHIR's cross-motion for summary judgment (Doc. 27). For the reasons that follow, Plaintiff's motion is denied and ONHIR's is granted.

## BACKGROUND

I.    The Settlement Act

In 1974, Congress enacted the Settlement Act, which authorized the partition of the Joint Use Area between the Hopi and Navajo tribes, resulting in the Hopi Partition Land ("HPL") and the Navajo Partition Land ("NPL"). 25 U.S.C. § 640d *et seq.* The Settlement Act "required members of each tribe to move from lands partitioned to the other tribe by 1986 and created a commission," now known as ONHIR, "to pay for the major costs of such relocations." *Clinton v. Babbitt*, 180 F.3d 1081, 1084 (9th Cir. 1999). "To be eligible

1   for benefits, an applicant [must] show that he (1) was a resident of the land partitioned to
2   the tribe of which he was not a member on December 22, 1974, and (2) was head of
3   household as of the date he moved away from the land partitioned to the tribe of which he
4   was not a member." *Barton v. Office of Navajo*, 125 F.4th 978, 980-81 (9th Cir. 2025).
5   The burden is on the applicant to make these showings. 25 C.F.R. § 700.147(b).

6   II.   Facts and Procedural History

7        On July 26, 2010, Plaintiff—an enrolled member of the Navajo Nation—applied to
8   ONHIR for relocation benefits under the Settlement Act. (Doc. 12 at 24-30.) Plaintiff
9   claimed that on December 22, 1974, she maintained a residence on the HPL "near Beshbito,
10  Arizona—close to Jeddito Island." (*Id.* at 28.) Plaintiff acknowledged, however, that she
11  was "not actually living in" the claimed residence on December 22, 1974—instead, she
12  "[l]ived with [her] parents in" Crownpoint, New Mexico, where her "[m]other and father
13  moved due to employment." (*Id.*) In a different section of the application, which asked
14  "If you have moved from the HPL, when did you move?", Plaintiff wrote: "Have lived in
15  other places but currently live in Gamerco, NM. Lived there since 1989. Also, lived in
16  Beshbito Valley." (*Id.* at 29.)

17       On April 12, 2011, ONHIR responded to Plaintiff's application by requesting
18  additional information to determine her eligibility for benefits, including a more precise
19  date as to when she moved off the HPL, information to support the claimed move-off date,
20  and information regarding her employment history. (*Id.* at 48-49.)

21       On July 1, 2011, after not receiving an answer, ONHIR sent a follow-up request for
22  the additional information and informed Plaintiff that failure to respond might result in
23  denial of her application. (*Id.* at 51.)

24       On August 16, 2011, Plaintiff sent ONHIR several documents, including several
25  affidavits and declarations, a certificate demonstrating college enrollment ("the Degree
26  Verify Certificate"), and a letter addressed to ONHIR attorney Aaron Hall ("the 2011
27  Letter"). (*Id.* at 69-77.) In the 2011 Letter, Plaintiff identified May 1978 as when she and
28  her family ceased being HPL residents: "The family was relocated in May of 1978." (*Id.*

at 69.)  Plaintiff also explained that her claim for relocation benefits was premised on her connections to a Navajo hogan dwelling on the HPL that belonged to her grandfather.  (*Id.*)  Plaintiff stated that she maintained contact with that land and considered it as her home during the relevant period despite living most of the time elsewhere.  (*Id.*)  In the final paragraph, Plaintiff asserted that "[a]fter getting out of high school and starting college," she "was basically self-sufficient and found odd jobs where [she] could to support herself" and "maintained contact with [her] family but [she] was living with her boyfriend . . . who[] . . . supported [her] and paid the rent on [their] apartment" until they broke up in 1982.  (*Id.*)

On June 20, 2012, ONHIR denied Plaintiff's application.  (*Id.* at 79-80.)  ONHIR based its denial on Plaintiff's failure to prove that she was "head of household" by her family's claimed move-off date of May 1978.  (*Id.* at 79-80.)

On July 12, 2012, Plaintiff filed a notice of appeal.  (*Id.* at 83-85.)

On October 6, 2017, ONHIR, through its independent hearing officer Harold Merkow ("IHO"), held a hearing.  (*Id.* at 176-235.)  Plaintiff and her aunt, LaRose Bedonie ("La Rose"), testified on Plaintiff's behalf.  (*Id.*)

On December 5, 2017, the parties submitted their post-hearing briefs.  (*Id.* at 225-235, 238-247.)  Plaintiff attached several documents to her brief, including a Navajo College Student Roster ("the Student Roster") (*id.* at 258-60), an ONHIR legal memorandum written by E. Susan Crystal that opines on the requirements to attain head-of-household status ("the Crystal Memorandum") (*id.* at 273-76), and the prior ONHIR benefits decisions in *Lorena Yellowhair*, No. 4981 ONHIR (2011) (*id.* at 278-82), and *Darlene Williams*, No. 5168 ONHIR (2010) (*id.* at 263-71).

On May 14, 2018, the IHO issued a decision upholding the denial of relocation benefits.  (*Id.* at 292-315.)  Although the IHO concluded that Plaintiff satisfied the first required element (*i.e.,* establishing residence on the HPL as of December 22, 1974), the IHO concluded that Plaintiff failed to satisfy the second required element (*i.e.,* having head-of-household status at the time of relocation) for two independent reasons: first,

because even accepting Plaintiff's claimed relocation date of May 1978, Plaintiff had not achieved head-of-household status by that point; and second, because Plaintiff ceased being a resident on the HPL before May 1978.  (*Id.* at 302-07.)  The IHO's reasoning is discussed in more detail below, in relation to the parties' specific arguments in this proceeding.

On June 20, 2018, ONHIR issued a notice of "Final Agency Action" in Plaintiff's case, affirming the IHO's denial of relocation benefits.  (*Id.* at 320.)

On February 22, 2024, Plaintiff filed this action, which seeks review of ONHIR's denial of benefits.  (Doc. 1.)

On August 20, 2024, Plaintiff moved for summary judgment.  (Doc. 22.)

On September 19, 2024, ONHIR filed a combined response and cross-motion for summary judgment.  (Doc. 27.)

On November 4, 2024, after receiving an extension of time (Doc. 31), Plaintiff filed a combined response and reply.  (Doc. 32.)

On January 24, 2024, after receiving an extension of time (Doc. 36), ONHIR filed a reply.  (Doc. 37.)

Neither side requested oral argument.

## DISCUSSION

I.    Legal Standard

"When summary judgment involves review of an administrative proceeding, we need only determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.   Under the Administrative Procedure Act ('APA'), we review ONHIR's decision to determine whether it was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence."  *Barton*, 125 F.4th at 982 (cleaned up).  "Under the arbitrary and capricious standard, we simply ensure that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained its decision.  For instance, a decision is arbitrary and capricious when

1    it relies on factors which Congress has not intended it to consider, entirely fails to consider

2    an important aspect of the problem, offers an explanation for its decision that runs counter

3    to the evidence before the agency, or is so implausible that it could not be ascribed to a

4    difference in view or the product of agency expertise." *Id.* (cleaned up). Although judicial

5    review under the APA must be "searching and careful," a reviewing court's role remains

6    "narrow." *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir. 1993). The

7    reviewing court cannot substitute its judgment for the agency's, especially where the

8    "challenged decision implicates substantial agency expertise." *Ninilchik Traditional*

9    *Council v. United States*, 227 F.3d 1186, 1194 (9th Cir. 2000).

10   II.    The Credibility Determination

11          An agency adjudicator's "credibility findings are granted substantial deference by

12   reviewing courts." *De Valle v. Immigration and Naturalization Serv.*, 901 F.2d 787, 792

13   (9th Cir. 1990) (citations omitted). This is because the "IHO alone is in a position to

14   observe a witness's tone and demeanor, to explore inconsistencies in testimony, and to

15   apply workable and consistent standards in the evaluation of testimonial evidence. He is

16   uniquely qualified to decide whether a witness's testimony has about it the ring of truth."

17   *Begay v. Office of Navajo & Hopi Indian Relocation*, 305 F. Supp. 3d 1040, 1049 (D. Ariz.

18   2018) (cleaned up). Thus, so long as an IHO "offer[s] a specific, cogent reason" for an

19   adverse credibility determination, *see De Valle*, 901 F.2d at 792 (citation and internal

20   quotation marks omitted), and that reason is supported by "substantial evidence," *Ceguerra*

21   *v. Sec. of Health & Hum. Servs.*, 933 F.2d 735, 738 (9th Cir. 1991), a reviewing court must

22   affirm.

23          A.    **The IHO's Credibility Determination**

24          One of the IHO's key findings—and one that will factor into the conclusions of law

25   addressed in later portions of this order—was that Plaintiff was not a credible witness.

26   (Doc. 12 at 299.) The IHO provided the following rationale for this determination:

27          Without documentation of amounts or records showing payments to
            [Plaintiff] for her claim of a scholarship or grant to attend college in
28          Albuquerque for her classes at UNM [the University of New Mexico],

[Plaintiff] is not a credible witness about such financial aid, which she claims to have received over forty years ago and which she herself stated she could not recall specifics of. [Plaintiff] also contradicted herself in claiming and then denying other wage-earning jobs during college in her letter to ONHIR and subsequently her testimony in this appeal. [Plaintiff] is also not a credible witness about her residence following her high school graduation as she declared in 2011 to ONHIR that she was being supported by her boyfriend while living with him in New Mexico after high school. No credible evidence was presented by [Plaintiff] to show that she was a self-supporting individual at any time before her family relocated from the Beshbito area of the Jeddito Chapter in or shortly after May 1978. Overall, [Plaintiff] is not a credible witness.

(*Id.*)

## B.    The Parties' Arguments

Plaintiff argues that the IHO's "adverse credibility finding . . . is unsupported by substantial evidence." (Doc. 22 at 7-10.) According to Plaintiff, the IHO's first reason for discrediting her testimony was that "she was not able to produce documents to support it"—more specifically, because "she did not produce a record of the amount of financial aid she received." (*Id.* at 7.) Plaintiff argues this approach was improper for two reasons: first, because a lack of documentary support does not render testimony untruthful; and second, in any event, because the pieces of documentary evidence she did produce—the Degree Verify Certificate, which shows she began college in 1977, and the Student Roster, which shows she received financial aid for her sophomore year starting in 1978—give rise to "a logical inference that she also received financial aid the previous year." (*Id.* at 7-8.) Plaintiff argues that the IHO's only other stated reason for discrediting her testimony was that it "was contradicted by what she stated in the 2011 Letter" but "[t]his letter provides no valid basis for finding [her] sworn testimony not credible" because it does not "contradict[] [her] testimony that she supported herself in her first year of college through her receipt of financial aid and by work-study income not reported to the IRS." (*Id.* at 8.) Next, Plaintiff argues that the IHO improperly ignored the testimony of her aunt, La Rose, and "completely exclude[d] [it] from [the] analysis, even though [it] corroborates [Plaintiff]." (*Id.*). Finally, Plaintiff contends her testimony was also "corroborated rather

than contradicted" by "sworn statements in her affidavit submitted in July 1994 in support of her late mother's relocation benefits application" and by the affidavits of her father, Freddie Miller ("Freddie"), and her uncle, Raymond Pete ("Raymond"), which the IHO "completely ignored." (*Id.* at 9.)

In its combined response and cross-motion, ONHIR argues that the IHO permissibly "determined that Plaintiff's testimony about receiving financial aid was questionable based on her admittedly hazy memory and contradictory statements about receiving support from her boyfriend in the [2011] Letter" and that this approach is consistent with previous IHO decisions. (Doc. 27 at 16-17.)   ONHIR also argues that Plaintiff's financial aid documentation did not corroborate her claim of being self-supporting during her first year of college because "Plaintiff could have received financial aid one academic year, but not the prior" and that, notwithstanding this fact, "the roster does not state how much assistance Plaintiff received . . . making it impossible to know whether she was a self-supporting head of household." (*Id.* at 17.)   Last, ONHIR argues that the 2011 Letter "contradicts [Plaintiff's] claim that she lived in the dorms and was self-supporting through financial aid." (*Id.*)

In her combined response and reply, Plaintiff reiterates that "the Agency fails to identify the specific and cogent reasons to support the adverse credibility findings in the instant case." (Doc. 32 at 2.) Plaintiff concludes: "No effort was made to evaluate whether testimony had about it 'the ring of truth' . . . since the IHO decided that because [Plaintiff] could not produce documentation of the receipt of financial aid he would find her testimony not credible.'" (*Id.* at 5.)

In its cross-reply, ONHIR argues that the IHO permissibly "determined that Plaintiff's testimony was not credible for four reasons: (1) Plaintiff's testimony about receiving financial aid lacked supporting documentation; (2) Plaintiff admitted that her memory regarding the specifics of financial aid was hazy; (3) Plaintiff's testimony about her living expenses being covered by financial aid was contradicted by the [2011 Letter], which mentioned two specific jobs; and, (4) Plaintiff's testimony that she stayed in the

dorms at [UNM] was contradicted by [the 2011 Letter], in which Plaintiff stated that she lived with, and was supported by, her boyfriend."  (Doc. 37 at 1-2.)  ONHIR adds that "[w]hile lack of documentation alone would be sufficient in certain circumstances to find a witness's testimony unreliable or not credible, the IHO here relied on more than just Plaintiff's lack of documentation to support his adverse credibility determination" and that "Plaintiff almost entirely ignores the other specific and cogent reasons which, when viewed cumulatively and in their totality, support the IHO's adverse credibility determination." (*Id.* at 2.)

### C.    Analysis

In light of the deferential standard of review that applies to credibility determinations, Plaintiff has not established that the IHO's adverse credibility determination was erroneous.

One of the IHO's proffered reasons for this determination was that Plaintiff made contradictory statements.  (Doc. 12 at 299 [concluding that Plaintiff was "not a credible witness" in part because she "contradicted herself" in various respects].)  This constitutes a specific and cogent reason for an agency adjudicator to discredit an applicant's testimony. *See generally Dong v. Garland*, 50 F.4th 1291, 1297 (9th Cir. 2022) ("Inconsistencies in an applicant's testimony may support an adverse credibility determination."); *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) ("Factors that the [agency] adjudicator may consider when making such credibility determinations include . . . inconsistencies in testimony . . . .").

This reason was also supported by substantial evidence.  *Begay v. Office of Navajo & Hopi Indian Relocation*, 2022 WL 17076043, *2 (9th Cir. 2022) ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  It is a highly deferential standard of review.") (cleaned up).  In the 2011 Letter, Plaintiff asserted:

> After graduation [from high school] in 1977, I moved to Albuquerque, NM to attend the University of New Mexico. . . .  After getting out of high school and starting college, I basically was self sufficient and found odd jobs where

I could to support myself. I maintained contact with my family but I was living with my boyfriend whom was from Jemez Pueblo. He supported me and paid the rent on our apartment while working as a park ranger. I was not able to make contact with him to get a statement to indicate his financial support during the period in question. I broke off my relationship with him in 1982. Thereafter, I . . . married my current husband and we started our family.

(Doc. 12 at 69.) However, when testifying, Plaintiff omitted any mention of living with her boyfriend and stated that, starting in the summer of 1977 and continuing into her first semester at UNM, she lived in the university dorms. (*Id.* at 185-87.)

Although Plaintiff is correct that the 2011 Letter did not specify exactly when she lived with her boyfriend in an apartment (Doc. 22 at 14), it was still rational for the ALJ to construe the 2011 Letter as, in context, indicating that this living arrangement was in place after Plaintiff graduated from high school in 1977 and began attending UNM. Indeed, Plaintiff's discussion of "living with my boyfriend . . . [who] paid the rent on our apartment" came almost immediately after Plaintiff's prefatory statement "[a]fter getting out of high school and starting college . . . ." It was thus rational for the IHO to interpret the 2011 Letter as indicating that Plaintiff began living with her boyfriend in an apartment during the summer after she graduated high school in 1977 and during her first semester of attending UNM—a timeframe that contradicts Plaintiff's testimony about living in the university dorms during that period. And even if it is also possible to construe the 2011 Letter in a different manner, it is a hornbook principle of administrative law that when, as here, the evidence is "susceptible to more than one rational interpretation, one of which supports the [agency adjudicator's] decision, the . . . conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). *See also Webb v. Office of Navajo and Hopi Indian Relocation*, 2024 WL 1756092, * 2 (9th Cir. 2024) ("Regardless of whether we would have drawn the same inferences, the IHO's credibility assessments rested on a permissible reading of the evidence. Where, as here, the agency relies on a permissible reading of the evidence, we cannot reject its view and substitute our own.").

This conclusion is not undermined by the IHO's failure to confront Plaintiff about

this perceived discrepancy or give her an opportunity to explain it—an omission that Plaintiff emphasizes in her motion papers. (Doc. 22 at 14.) Tempting as it may be, in hindsight, to question how the IHO went about making credibility determinations, it must not be overlooked that the "IHO alone is in a position to observe a witness's tone and demeanor, to explore inconsistencies in testimony, and to apply workable and consistent standards in the evaluation of testimonial evidence." *Begay*, 305 F. Supp. 3d at 1049. Additionally, and more important, Plaintiff has cited no authority—and the Court is aware of none—requiring IHOs to confront witnesses with perceived inconsistencies before discrediting their testimony on the basis of those inconsistencies. *Cf. Mulay v. Colvin*, 2015 WL 1823261, *6 (C.D. Cal. 2015) (acknowledging that, in the asylum context, "[o]nce a perceived inconsistency between the written record and the oral testimony arises, the ALJ must confront the claimant with the inconsistency and if an explanation is made address that explanation," but explaining that there is "no authority for the proposition that [this rule] applies in adjudicating social security disability appeals, which are governed by a different statutory and regulatory framework") (citations omitted).

Although the analysis as to inconsistencies could end there, the ALJ's finding on this issue was also supported by substantial evidence for other reasons. Plaintiff claimed in the 2011 Letter that she "provided clerical services in two offices on the UNM Campus," working "20 hours per week," and added that "during the breaks, [she] was able to work more hours," although "these wages were not reported to the Social Security Administration." (Doc. 12 at 69.) Plaintiff also claimed in the 2011 Letter that "[a]fter getting out of high school and starting college, I was basically self sufficient and found odd jobs where I could support myself," even though the 2011 Letter also stated that Plaintiff's boyfriend paid the rent on their shared apartment. (*Id.*) Meanwhile, during the hearing, Plaintiff at times referred to her "Work Study job" and stated that she "depended highly upon . . . working" and "work[ed] stead[y] jobs." (*Id.* at 192.) However, in response to later questions about her finances, Plaintiff omitted mention of her campus jobs (or any other jobs) and seemed to claim that her Navajo Nation scholarships and Pell grants

covered her tuition, room, and board, and left her a little money for spending, albeit barely enough to pay for clothing. (*Id.* at 197.) And in still other points during her testimony, Plaintiff acknowledged receiving an unspecified amount of money from her parents—albeit not "a lot" of money—to pay for college. (*Id.* at 186.) The IHO concluded that these various representations were internally inconsistent: "[A]pplicant wrote a letter to ONHIR, dated August 15, 2011, in which she declared: 'After getting out of high school and starting college, I was basically self sufficient and found odd jobs where I could support myself' . . . . Applicant claimed in the same letter . . . to have earned income from two different jobs on the UNM campus, asserting she worked 20 hours per week and during the breaks, but in her testimony she denied other sources of income or even means to pay for things like clothing, though she contradictorily referenced working in her second year for wages." (*Id.* at 298, citations omitted.) Based in part on these perceived contradictions, the IHO found that Plaintiff was not a credible witness: "Applicant also contradicted herself in claiming and then denying other wage-earning jobs during college in her letter to ONHIR and subsequently her testimony in this appeal." (*Id.* at 299.)

It was rational for the IHO to conclude that Plaintiff's job-related assertions in the 2011 Letter and during her hearing testimony were inconsistent. For example, although Plaintiff emphasizes that the 2011 Letter did not provide an exact "time reference" for when she held the "odd jobs where I could support myself" (Doc. 22 at 13), a plausible reading of the 2011 Letter is that Plaintiff held those odd jobs immediately "[a]fter getting out of high school and starting college." (Doc. 12 at 69.) It was rational for the ALJ to interpret the 2011 Letter in that fashion and then conclude that Plaintiff's testimony was contradictory. Indeed, if Plaintiff's financial aid was as substantial as she claimed during the hearing, and she also worked for 20 or more hours per week and received additional financial support from her parents, it seems unlikely she would have struggled to pay for basic things like clothing, as she testified. (*Id.* at 197-98). This is especially true considering that Plaintiff was not, by her own admission, paying taxes on some income and that Plaintiff's boyfriend may have been paying the rent on their shared apartment. (*Id.*

- 11 -

at 69).  And again, even if a different factfinder might have reached a different conclusion as to whether Plaintiff's various statements on this topic were reconcilable, when the evidence is "susceptible to more than one rational interpretation, one of which supports the [agency adjudicator's] decision, the . . . conclusion must be upheld." *Thomas*, 278 F.3d at 954.  *See also Webb*, 2024 WL 1756092 at *2.[1]

Nor is there any merit to Plaintiff's argument that the credibility determination constitutes reversible error because the IHO ignored the testimony of her aunt and the affidavits of her uncle and father.  The IHO did not "completely exclude" La Rose's testimony from its analysis after determining that La Rose was "more or less credible." (Doc. 22 at 8.)  To the contrary, the IHO cited La Rose's testimony in later portions of the decision, in *support* of Plaintiff's contention that her studies likely prevented her from making frequent visits to the HPL.  (Doc. 12 at 311 ["[H]er aunt testified [Plaintiff] returned only when her studies allowed."]).  More important, nothing in La Rose's testimony directly supports Plaintiff's central claims regarding head-of-household status and residency or calls into question the findings of inconsistency identified above. Although Plaintiff asserts that La Rose's testimony "corroborates" her own testimony (Doc. 22 at 8), the only explanation for this assertion—indeed, the only time Plaintiff cites

---

[1]    ONHIR argues that the IHO identified Plaintiff's "hazy" memory "regarding the specifics of financial aid" as a distinct reason, separate and apart from the contradictory nature of Plaintiff's testimony on that topic, supporting the adverse credibility finding. (Doc. 37 at 1-2.)  The Court does not share this interpretation of the IHO's opinion—the IHO merely seemed to note that Plaintiff "herself could not recall specifics" regarding her financial aid in the course of explaining why the IHO was discounting Plaintiff's credibility for other reasons.  (Doc. 12 at 299.)  With that said, if ONHIR's interpretation of the IHO's opinion is correct, it would have been permissible for the IHO to take the haziness of Plaintiff's memory into account when evaluating the persuasiveness and credibility of her testimony.  *Ambrose v. Office of Navajo & Hopi Indian Relocation*, 2024 WL 1553706, *1 (9th Cir. 2024) ("Here, the IHO articulated specific grounds for disbelieving the material testimony of Ambrose and for crediting her brother's more detailed recollection of when the partition fence was erected.  The IHO explained that Ambrose's brother had a much better recollection of events involving the family's living situation . . . .  This detailed description contrasted with Ambrose's bald assertion that the fence was erected 'in Autumn' without any supporting rationale.") (cleaned up).  *See also Kuifeng Cheng v. Holder*, 515 F. App'x 700, 702 (9th Cir. 2013) ("Here, the agency's adverse credibility determination did not rest only on the alleged inconsistency between Cheng's written application and his hearing testimony.  The IJ and BIA articulated several other 'specific and cogent' reasons why Cheng was not credible, including other inconsistencies in Cheng's testimony, *his vague recollection of events*, and his general demeanor.") (emphasis added).

1    La Rose's testimony at all—is that La Rose's testimony supports Plaintiff's claim that she

2    attended UNM beginning in August 1977 (*id.* at 12).  But the IHO accepted Plaintiff's

3    testimony as to this date.  (Doc. 12 at 296 ["After applicant graduated from high school,

4    she attended college at [UNM], beginning in the summer of 1977."].)  Meanwhile, although

5    the IHO did not specifically reference the affidavits from Plaintiff's father and uncle, those

6    documents do not support Plaintiff's central claims regarding head-of-household status and

7    residency or call into question the findings of inconsistency identified above.  For example,

8    Raymond's affidavit does not assert that Plaintiff considered Beshbito to be her home, does

9    not discuss her living arrangement with her boyfriend, and does not address her finances

10   and job-related wages during college.  (Doc. 12 at 251-52.)[2]  Similarly, Freddie's affidavit

11   does not address those topics.  (*Id.* at 249-50.)

12   Finally, as an additional reason for the adverse credibility finding, the IHO

13   identified Plaintiff's failure to provide documentary support for her claims regarding her

14   receipt of financial aid during college.  (Doc. 12 at 299 ["Without documentation of

15   amounts or records showing payments to applicant for her claim of a scholarship or grant

16   to attend college in Albuquerque for her classes at UNM, applicant is not a credible witness

17   about such financial aid . . . ."].)  If this were the IHO's only reason for the adverse

18   credibility finding, it likely would have been insufficient.  *Todicheeney v. Office of Navajo*

19   *and Hopi Indian Relocation*, 2024 WL 1574346, *2 (9th Cir. 2024) ("To the extent the

20   IHO declined to consider testimony regarding Todicheeney's sheepherding or work for

21   neighbors solely based on a lack of corroborating physical documentation and without

22   providing specific, nonconclusory reasons as to why that testimony was not otherwise

23   credible, this was error.  The IHO should have calculated how much income Todicheeney

24   earned from these sources of income and factored this result into his analysis of whether

25   Todicheeney was self-supporting.  Indeed, the ONHIR may accept undocumented income

26   when determining whether the $1,300 threshold was met given that individuals on the HPL

27   _____

28   [2]    Moreover, Raymond's assertion that Plaintiff and her siblings "returned to the HPL
     on a bi-weekly basis all the way up until [their mother] became severely ill in the mid-
     1980s" (Doc. 12 at 251 ¶ 4) is difficult to reconcile with Plaintiff's contention that her
     family moved off the HPL by May 1978.

often work odd jobs to support themselves and for which no documentation exists."); *Yazzie v. Off. of Navajo & Hopi Indian Relocation*, 2024 WL 1904560, *4 (9th Cir. 2024) ("[A]lthough the IHO noted that there is no documentary evidence about financial aid being provided to Yazzie while he attended Navajo Community College, the IHO also expressly found that Yazzie was a credible witness except for his home-visit testimony, and Yazzie specifically testified that he had received financial aid.") (cleaned up).  However, this was not the IHO's only reason, and the Ninth Circuit has indicated that it is permissible for an IHO to identify a lack of supporting documentary evidence as an additional reason for rejecting an applicant's testimony when it is coupled with other legally sufficient reasons for rejecting that testimony—such as, in this case, an express adverse credibility finding due to inconsistent testimony.  *Webb*, 2024 WL 1756092 at *2 ("The IHO also expressly rejected, as likewise lacking in credibility, Manygoats' and her sister's testimony about earning money from weaving rugs.  Because the IHO found the testimony about the Arizona Academy to be affirmatively 'fictitious,' the IHO permissibly drew the inference that the entirety of Manygoats' claims about her income were 'insincere' and 'contrived.'  The IHO therefore was not required to identify specific discrepancies with respect to the rug weaving testimony.  Moreover, nothing about that rug weaving testimony is so overwhelmingly compelling as to allow us to say that, although the IHO permissibly found that Manygoats and her sister had lied about attending Arizona Academy, he was nonetheless required to credit their testimony about rug weaving.  The testimony was not supported by any objective evidence, and it therefore rested entirely on whether they were testifying credibly.").  *See also Whitehair v. Off. of Navajo & Hopi Indian Relocation*, 2018 WL 6418665, *3 (D. Ariz. 2018) ("Contrary to Plaintiff's assertion, the Hearing Officer provided several specific, cogent reasons for discrediting Plaintiff's income testimony.  Defendant is required to determine whether Plaintiff 'actually maintained and supported' himself.  In so doing, the Hearing Officer is not required to take at face value Plaintiff's testimony that he earned a certain income; the Officer may consider lack of documentation . . . .") (citation omitted).  *See generally Lopez-Umanzor v. Gonzales,* 405

F.3d 1049, 1059 (9th Cir. 2005) ("Our law has long recognized that a person who is deemed unbelievable as to one material fact may be disbelieved in all other respects.").

It was also permissible for the IHO to conclude that Plaintiff's proffered pieces of documentary evidence did not support her testimony regarding her receipt of financial aid during the 1977-1978 school year. Plaintiff provided a Navajo College student roster showing that she received a scholarship to attend UNM for the 1978-1979 school year, but she submitted no evidence of the amount of that scholarship. (Doc. 12 at 258-61.) Plaintiff also provided a Degree Verify Certificate demonstrating that she was enrolled in classes at UNM beginning in August 1977 and continued taking classes until 2011. (*Id.* at 75, 256.) Although Plaintiff argues that evidence of her second-year financial aid establishes that she also received first-year financial aid, it was permissible for the IHO to decline to make such an inference—students sometimes receive financial aid during some years but not others and Plaintiff made various statements that could be rationally construed as inconsistent with the idea that she was receiving substantial financial aid during the 1977-1978 school year, including her statement that her boyfriend was paying for her to live in an apartment at that time (*id.* at 69) and her statement that her parents were providing an unspecified amount of money for her to attend college (*id.* at 186). Moreover, because the student roster from 1978-1979 did not reflect the amount of financial aid Plaintiff received that year, any inference regarding Plaintiff's receipt of substantial financial aid during the preceding year was further weakened. Once again, "[r]egardless of whether we would have drawn the same inferences, . . . [w]here, as here, the agency relies on a permissible reading of the evidence, we cannot reject its view and substitute our own." *Webb*, 2024 WL 1756092 at * 2.

III.    The Head-Of-Household Determination

As noted, the second element of a claim for relocation benefits is that the applicant "was head of household as of the date he moved away from the land partitioned to the tribe of which he was not a member." *Barton*, 125 F.4th at 980-81. Plaintiff's theory was that her move-off date fell in May 1978 and that she had achieved head-of-household status by

1  that date.  (Doc. 12 at 304-05.)

2  　　　　As relevant here, "a single person may constitute a household if he or she at the time

3  of his/her residence on land partitioned to the Tribe of which he/she is not a member

4  actually maintained and supported him/herself . . . .  That single person would then be the

5  head of that one-person household."  *Yazzie*, 2024 WL 1904560 at *1 (cleaned up).  ONHIR

6  has a long-standing policy of considering an applicant who earned at least $1,300 per year

7  to be *prima facie* self-supporting for relocation purposes.  *Tohannie v. Off. of Navajo &*

8  *Hopi Indian Relocation*, 2022 WL 17987268, *3 (D. Ariz. 2022) ("At the very least, an

9  income of more than $1,300 has long been viewed as powerful evidence of self-support

10 although ONHIR might, in the right situation, be able to produce evidence establishing

11 otherwise.").

12 　　A.　　**The IHO's Ruling**

13 　　　　The IHO concluded that, even accepting Plaintiff's contention that May 1978 was

14 the relevant move-off date, no "documentary" or otherwise "credible evidence exists in the

15 record of this appeal to show that [Plaintiff] was a self-supporting head of household at any

16 time she attended college in New Mexico prior to the family's abandonment of the

17 Beshbito area . . . in May 1978."  (Doc. 12 at 306.)  The IHO stated that although Plaintiff

18 premised her claim of self-support as of May 1978 on her receipt of a tribal scholarship

19 and a Pell grant to attend UNM during the 1977-1978 school year, "she offered no proof

20 other than her admittedly poor recollection of such income."  (*Id.* at 312.)  The IHO also

21 noted that although Plaintiff claimed to have worked several "odd jobs" during her first

22 year of college to support herself, Plaintiff's "first reported earnings are in 1979, post-

23 dating her grandmother's abandonment of the HPL homesite."  (*Id.*)  Last, the IHO stated

24 that Plaintiff's statement in the 2011 Letter that "[a]fter getting out of high school and

25 starting college," she "was living with [her] boyfriend who[] . . . supported [her] and paid

26 the rent on [their] apartment" further undermined her claim that she was self-supporting as

27 of May 1978.  (*Id.* at 306.)

28 　　　　…

- 16 -

B.     **The Parties' Arguments**

Plaintiff first argues that the IHO's head-of-household determination was arbitrary and capricious because the IHO failed to follow its own prior precedent set in the case of *Yellowhair*. (Doc. 22 at 10-12.) Next, Plaintiff argues that the IHO's decision to deem the "Degree Verify Certificate" insufficient to support her testimony regarding the receipt of financial aid was arbitrary and capricious because it runs contrary to "ONHIR's self-supporting criteria policy as set forth by E. Susan Crystal in her memorandum." (*Id.* at 12-13.) Last, Plaintiff argues that the IHO's determinations regarding her living situation with her boyfriend "are based on speculation rather than on substantial evidence." (*Id.* at 13-14.) Specifically, Plaintiff argues that the IHO's reliance on the statements in the 2011 Letter was misplaced because it never specified the exact start date of her relationship with her then-boyfriend and she was never questioned about the perceived discrepancy by the IHO. (*Id.* at 14.)

In its combined response and cross-motion, ONHIR argues that "[o]ne prior decision by the IHO does not create 'precedent' as Plaintiff suggests." (Doc. 27 at 12-13.) ONHIR also emphasizes that the IHO explicitly considered the *Yellowhair* decision and explained its deviation from that case on several grounds, including that the IHO found the *Yellowhair* applicant, unlike Plaintiff, to be credible and to have submitted documents more corroborative of the claims. (*Id.* at 13.) ONHIR also argues that by considering Plaintiff's lack of documentation in support of her financial aid claims, the IHO was operating consistent with the Crystal Memorandum, which specifically provides that "[t]hose individuals who were under 21 and unmarried or not custodial parents as of the time of certification, will have their cases reviewed carefully and additional information will be requested if necessary." (*Id.* at 13, citing Doc. 12 at 275.) Last, ONHIR argues that the IHO reasonably interpreted the statements in the 2011 Letter to mean that Plaintiff lived with and was supported by her boyfriend during the 1977-1978 school year. (*Id.* at 14.)

In her combined reply and cross-response, Plaintiff argues that although ONHIR may be correct that a single prior decision does not create precedent, the IHO's deviation

from *Yellowhair* "does require more of an explanation than Defendant offers." (Doc. 32 at 6.) Plaintiff challenges ONHIR's attempts to distinguish *Yellowhair*, arguing first that the IHO failed to explain how "absence of documentation" justified the adverse credibility determination in her case, but not in *Yellowhair*, when neither applicant provided documentation. (*Id.* at 6.) Plaintiff also argues that "ONHIR offers no explanation as to why Mr. Yellowhair's transcript is more probative of the receipt of financial aid than the two documents produced by [Plaintiff]." (*Id.*) Next, Plaintiff appears to argue that ONHIR's assertion that the Crystal Memorandum "does not establish the types of evidence necessary or sufficient for an applicant to satisfy the criteria" for self-support constitutes a concession that the IHO was wrong in finding that the Degree Verify Certificate insufficiently supported Plaintiff's claim of self-support. (*Id.* at 8.) Last, Plaintiff argues that although "there is ambiguity" between her testimony and some of the statements in the 2011 Letter, this ambiguity "does not overcome her claim of self-support" because "[t]he head-of-household standard for the eligibility of a single individual is not defeated by the provision of lodging and meals . . . as long as the applicant can show they met the $1,300 threshold," which she claims to have met because although "the amount of financial aid [she] received is not known . . . she testified it covered room and board and tuition, and left a little over for spending money . . . [which] would certainly meet the $1,300 threshold." (*Id.* at 9-10.)

In its cross-reply, ONHIR argues that the IHO sufficiently explained its reasons for distinguishing *Yellowhair*—namely, by "stating that Plaintiff, unlike Loren Yellowhair, 'contradicted her own prior statements in important ways and without explanation.'" (Doc. 37 at 5, citing Doc. 12 at 313.) ONHIR also argues that Plaintiff's failure to include the administrative record from *Yellowhair* in her post-hearing memorandum prevents it from addressing why the IHO found the college transcript in *Yellowhair* to be more persuasive that Plaintiff's documents, and therefore Plaintiff has failed to establish that *Yellowhair* has any precedential value. (*Id.* at 6.) Last, ONHIR argues that Plaintiff's argument that her financial aid must have exceeded $1,300 as a matter of common sense, "though novel,

fails" because she waived it by not making it at the agency level or in her initial motion, or alternatively, because the $1,300 income threshold, according to the Crystal Memorandum, only applies to earnings rather than financial aid. (*Id.* at 9.)

### C. **Analysis**

The IHO's finding that Plaintiff failed to establish that she was a "head of household" as of May 1978 was not arbitrary and capricious and was supported by substantial evidence.

To start, Plaintiff is correct that ONHIR must follow its own precedent, but "this merely requires that the agency apply the law consistently to cases with similar material facts; it does not require the agency find the same facts for different parties, in different proceedings, and based on different evidence." *Stago v. Off. of Navajo & Hopi Indian Relocation*, 562 F. Supp. 3d 95, 105 (D. Ariz. 2021) (cleaned up). *See also Whitehair*, 2018 WL 6418665 at *3 ("Plaintiff cites no authority to suggest that the five hearing officer decisions should have had any precedential value in this case, nor can the Court conclude that Plaintiff's hand-picked sample of cases represents a 'settled course of adjudication' and 'a general policy by which [Defendant's] exercise of discretion will be governed,' as Plaintiff claims.")  Here, the IHO considered Plaintiff's argument regarding *Yellowhair* and concluded that Plaintiff's reliance on that case was misplaced because the *Yellowhair* applicant was found credible whereas Plaintiff was not.  This alone is a sufficient basis for distinguishing the two cases.  Plaintiff argues that the IHO erred in distinguishing the cases on this basis because "[n]either [applicant] produced documentation of the receipt of financial aid.  However, the absence of documentation alone was a basis for the IHO's finding that [Plaintiff] was not credible, but not so for Mr. Yellowhair."  (Doc. 32 at 6.)  But this is inaccurate for the reasons outlined in Part II above—the IHO did not base its adverse credibility determination solely on Plaintiff's lack of documentation.

The IHO also distinguished *Yellowhair* based on Plaintiff's failure to provide a college transcript, which the IHO referred to as a "material omission." (Doc. 12 at 313-14.)  The IHO wrote that whereas the *Yellowhair* applicant provided a college transcript,

"[t]he college 'certificate' submitted by [Plaintiff] here shows 'No Degree—Enrollment Only' without identifying any classes taken over the entire period of 8/1977 to 5/2011, nor any course grades or even whether courses were passed.  That document is insufficient for [Plaintiff] to rely upon to support her already imprecise and ambiguous testimony." (*Id.* at 314.)  Although the IHO's explanation of this basis for distinguishing *Yellowhair* could have been more fully fleshed out, it is at least plausible that a college transcript would be more probative of Plaintiff's claimed receipt of financial aid during the 1977-1978 school year than Plaintiff's two proffered documents.  For example, scholarships and grants might require full course loads or certain grade point averages—information that is not set forth in the Degree Verify Certificate.

Nor is Plaintiff entitled to reversal based on her arguments concerning the Crystal Memorandum, which says nothing about what types of documentation are required to show head-of-household status and clearly indicates that "additional information will be requested if necessary."  (Doc. 12 at 275.)  The IHO exercised this prerogative and concluded that Plaintiff's proffer of the Degree Verify Certificate and the 1978-1979 student roster was, under all of the circumstances (including the determination that Plaintiff had provided hazy and inconsistent testimony on certain topics), insufficient to establish Plaintiff's claims regarding both the fact and amount of her receipt of financial aid during the 1977-1978 school year.  This decision was not arbitrary and capricious.

Last, ONHIR did not commit reversible error by considering Plaintiff's statements in the 2011 Letter as part of the basis for concluding that Plaintiff failed to meet her burden of showing that she had reached head-of-household status as of May 1978.  As discussed in Part II above, although the statements in the 2011 Letter concerning Plaintiff's living arrangement with her boyfriend are open to competing interpretations, they are more than a "scintilla" of evidence, which is all that is required in this context.  And even if the IHO was wrong to conclude that Plaintiff must not have received "any" financial aid during the 1977-1978 school year if she was living with her boyfriend (Doc. 12 at 312), the evidence that Plaintiff lived with her boyfriend still undermines Plaintiff's argument that her

1    financial aid necessarily must have exceeded $1,300 because "it *covered room and board*

2    *and tuition, and left a little over for spending money*" (Doc. 32 at 9-10, emphasis added).[3]

3    IV.    The Change-In-Residency Determination

4          Although the analysis could end there, the Court will also analyze the IHO's

5    alternative basis for rejecting Plaintiff's application—that Plaintiff ceased being a resident

6    on the HPL before her claimed move-off date of May 1978—in an abundance of caution

7    and in an effort to create a complete record in the event of further appeal.

8          A.    **The IHO's Ruling**

9          As background, Plaintiff was born in January 1960.  (Doc. 12 at 294.)  During her

10   childhood, Plaintiff lived with her parents "in Crownpoint, New Mexico," which is "not

11   within the [HPL]," but Plaintiff's family also "maintained a traditional residence and

12   Chapter membership in the Beshbito area in the Jeddito Chapter," which is within the HPL.

13   (*Id.*)  The reason for this living arrangement was that "[f]or thirty-five years, including the

14   time from 1970 to 1978, [Plaintiff's] mother worked in Crownpoint, New Mexico, as a

15   Registered Nurse in the Indian Health Service hospital there.  [Plaintiff's] family lived in

16   Crownpoint, in government housing rented from the Indian Health Service through [her]

17   mother's employment.  [Plaintiff's] mother was required to work some weekends but, on

18   the weekends and holidays when she didn't work, [Plaintiff's] mother and [Plaintiff]

19   returned to visit their relatives who were living in the Beshbito area of the Jeddito Chapter."

20   (*Id.* at 295.)

21         Due to this living arrangement, Plaintiff attended elementary school in Crownpoint

22   from 1970 through 1974.  (*Id.*)  Next, from 1975 through 1977, Plaintiff "was sent to St.

23   Michaels Indian School" for boarding school.  (*Id.*)  During this period, Plaintiff's parents

---

24   [3]     As ONHIR correctly notes, during the agency proceedings, Plaintiff did not raise
25   the argument that her financial aid, based on the surrounding circumstances, must have
     exceeded $1,300.  Plaintiff also did not raise this argument in her summary judgment
26   motion and instead raised it for the first time in her reply.  Accordingly, this argument is
     likely forfeited.  *Reid v. Engen*, 765 F.2d 1457, 1460 (9th Cir. 1985) ("As a general rule, if
27   a petitioner fails to raise an issue before an administrative tribunal, it cannot be raised on
     appeal from that tribunal."); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The
28   district court need not consider arguments raised for the first time in a reply brief.").
     Nevertheless, it is unnecessary to decide the issue of forfeiture because, as discussed above,
     the argument also fails on its merits.

continued living in Crownpoint, and on weekends Plaintiff would "sometimes" return to Crownpoint to visit them but on "other weekends [she] visited her family in Beshbito when her parents would take her."  (*Id.* at 296.)  Next, after graduating from high school in May 1977, Plaintiff moved to Albuquerque, where she was living as of January 1978 (when she turned 18) and as of May 1978.  (*Id.* at 184-89, 296-97.)  During this period, Plaintiff's parents continued living in Crownpoint.  (*Id.* at 296-97.)  Finally, in May 1978, Plaintiff's "maternal grandfather died . . . and thereafter the family abandoned the HPL homesite and never returned."  (*Id.* at 297.)

These details provide the backdrop for Plaintiff's claim that she remained a "resident" of land on the HPL (*i.e.*, her family's homesite in Beshbito) until May 1978[4] notwithstanding the fact that she lived in and attended elementary school in Crownpoint, New Mexico from at least 1970 (if not earlier) through 1974, then lived in and attended boarding school in St. Michaels, Arizona from 1975 through 1977, and then lived in and attended college in Albuquerque, New Mexico from the summer of 1977 through May 1978.  Under Ninth Circuit law, it is possible to maintain a claim of residency under these circumstances.  *Barton*, 125 F.4th at 983 ("[A]n applicant who is physically away from their homesite for education or employment can still establish residency for relocation benefits eligibility.").  The IHO recognized this point in the underlying decision.  (Doc. 12 at 304 ["[I]ndividuals who do not actually live on partitioned lands but maintain substantial and recurring contacts with an identifiable homesite as 'residents' of partitioned lands for purposes of the Act and regulations."].)

---

[4]    As the Ninth Circuit has recognized, an applicant's *family's* abandonment of an HPL website on a particular date does not necessarily preclude the *applicant* from claiming a personal intent to reside at that homesite after that date.  *Barton*, 125 F.4th at 983-84 ("[T]he IHO found that by operation of law, the HPL homesite could not be Manley's legal residence after his grandparents' 1984 relocation from the HPL homesite. . . .  This reasoning fails to comport with the residency standard.  Indeed, it is unclear how Manley's grandparents' relocation demonstrates Manley's intent to reside at the HPL homesite or is otherwise a manifestation of his intent.  And there is no authority to suggest that this fact automatically establishes that Manley is not a legal resident.").  Here, however, Plaintiff has never argued that a relocation date after May 1978 should apply.  (Doc. 22 at 6 ["The issue in this matter is whether [Plaintiff's] legal residence at her family's HPL homesite continued from December 22, 1974 through May 1978, when her family abandoned their HPL homesite."].)

The determination of Plaintiff's residency status was further complicated by her status as a minor during some of the periods in question. The IHO correctly noted that "ONHIR has a long-standing policy of imputing a parent's residence to an unemancipated minor." (*Id.* at 303.) Thus, for purposes of addressing the first element of Plaintiff's claim for relocation benefits (*i.e.*, whether she was a resident on the HPL as of December 22, 1974), the IHO looked to the residency status of Plaintiff's parents on that date. Even though Plaintiff's parents were living in Crownpoint on that date (and had been living in Crownpoint for years, due to Plaintiff's mother's work), the parties stipulated that Plaintiff's parents—and, thus, Plaintiff—were still "residents" on the HPL on that date. (*Id.* at 304-05 ["In this case, the parties stipulated that [Plaintiff] was a legal resident of the [HPL] as of December 22, 1974, because she was fourteen years old, and her residency was derivative of her parents, who were found eligible for relocation benefits."].)

As noted, the second element of a claim for relocation benefits is that the applicant "was head of household as of the date he moved away from the land partitioned to the tribe of which he was not a member." *Barton*, 125 F.4th at 980-81. This element thus requires two inquiries: *first*, identifying the date on which the applicant moved away from the partitioned land; and *second*, determining whether the applicant had achieved head-of-household status by the date. As discussed in Part III above, the IHO permissibly concluded that even assuming the move-off date was May 1978 (as Plaintiff claimed), Plaintiff had not achieved head-of-household status by the date. Additionally, as an alternative basis for denying relief, the IHO concluded that Plaintiff's actual move-off date was earlier:

> Alternatively, if [Plaintiff] can be considered to have become a head of household by virtue of her receipt of financial aid to attend college in New Mexico sometime after May 1977, when she graduated from high school, [Plaintiff's] primary and legal residence was in Crownpoint, New Mexico (and possibly Albuquerque, New Mexico, with her boyfriend) at the time she received financial aid as an adult (turning 18 in January 1978), and her return visits to Beshbito where her maternal grandparents lived were neither sufficiently recurring nor substantial as such visits were dependent on [Plaintiff's] mother's availability to drive her to Beshbito and her own time

availability.  Such visits occurred irregularly, for brief periods of time, and were infrequent, as [Plaintiff] relied on her mother for transportation and according to her testimony would have been visiting other places as well, off the HPL . . . .  [Plaintiff] herself referred to Crownpoint as "home" and Beshbito as a place to go from her home in Crownpoint during this time period.

(Doc. 12 at 306-07.)  In support of this conclusion, the IHO emphasized that "[n]one of the recognized indicia of legal residence apply to [Plaintiff's] claim as there is no evidence that [Plaintiff] ever used her grandmother's residence as her own, [Plaintiff] did not own any livestock at Beshbito, [Plaintiff] did not have her own dwelling at her grandmother's homesite, none of [Plaintiff's] records show her grandmother's address, there is no evidence that [Plaintiff] ever used her grandmother's address on medical records, a driver's license, or voting records, and she offered no evidence or testimony to meet her burden of proving that she intended to make and keep Beshbito as her home and legal residence as an adult."  (*Id.* at 315.)

### B.    **The Parties' Arguments**

Plaintiff argues that the IHO's determination that she "changed her legal residence to either Crownpoint or Albuquerque in January 1978 is arbitrary and capricious and is unsupported by substantial evidence."  (Doc. 22 at 14.)  The gravamen of Plaintiff's argument appears to be that the IHO "completely ignore[d]" statements in the 2011 Letter that purportedly support her residency claims—such as the statements that Plaintiff's mother never considered Crownpoint to be Plaintiff's mother's home and that they both considered Plaintiff's grandparents' hogan to be their home—and instead "myopically focuse[d]" on the portion of the 2011 Letter referring to her living arrangements with her then-boyfriend in Albuquerque, which at best provides "speculative" support for the notion that Plaintiff changed her residence to Albuquerque.  (*Id.* at 13-14.)  Plaintiff reiterates, as she did in support of her arguments on other issues, that reliance on this statement was misplaced because the 2011 Letter never specified the exact start date of her relationship with her then-boyfriend and she was never questioned about it by the IHO.  (*Id.* at 14.)

1  Plaintiff also argues that the IHO's change-in-residency determination conflicts with
2  *Darlene Williams*, which was issued by the same IHO. (*Id.* at 15.) Last, Plaintiff argues
3  that the IHO's decision ignores the affidavit she submitted in support of her mother's
4  application for relocation benefits. (*Id.*)

5       In its combined response and cross-motion, ONHIR argues that the IHO's decision
6  was not arbitrary and capricious because the IHO "identified several records-based grounds
7  for determining Plaintiff was not an HPL resident in 1977." (Doc. 27 at 14-15.) ONHIR
8  also argues that Plaintiff's reliance on *Williams* is misplaced and that her proffered affidavit
9  evidence is immaterial for the reasons already addressed by the IHO—namely, because the
10 affidavit "does not identify a single period of time . . . and the focus of her mother's appeal
11 was whether her mother had legal residence on HPL in 1974—not 1977 or 1978." (*Id.* at
12 16, citing Doc. 12 at 314.)

13      In her combined reply and cross-response, Plaintiff argues that her supposed failure
14 to quantify her visits to the HPL is not substantial evidence because, according to the recent
15 decision in *Yazzie*, "[a]ttendance at college away from one's home rarely constitutes a
16 change of legal residence regardless of how often the student returns home." (Doc. 32 at
17 10.) Plaintiff also argues that "providing support for ill relatives and assisting with the
18 chores related to a pastoral lifestyle certainly would render her visits substantial." (*Id.* at
19 11). Next, Plaintiff objects to ONHIR's references to the "recognized indicia" of
20 residency, arguing that consideration of such indicia conflicts with the "economic realities"
21 of life on the reservation and ONHIR policy. (*Id.* at 11-12.) Last, Plaintiff disputes
22 ONHIR's attempt to distinguish *Williams*. (*Id.* at 12.)

23      In its cross-reply, ONHIR argues that Plaintiff's reliance on *Yazzie* is misplaced for
24 two reasons: (1) although *Yazzie* stands for the proposition that "an applicant's attendance
25 at an out-of-town college does not result in a change of residency for the applicant to the
26 college town (unless the applicant intends to stay there after finishing school)," that case
27 was decided in 2024, six years after the IHO issued its decision in this case, and therefore
28 should not provide the framework for analyzing whether the IHO's decision was arbitrary

and capricious or contrary to law; and (2) even assuming *Yazzie* applies, it would only preclude Plaintiff's residence in Albuquerque from constituting her new legal residence and not her Crownpoint residence, which the IHO focused on as the most likely residence for Plaintiff during the 1977-1978 year. (Doc. 37 at 9-10.) Last, ONHIR argues that, contrary to Plaintiff's suggestion that consideration of the listed "indicia" conflicts with ONHIR policy or the economic realities of Plaintiff's situation, consideration of such indicia is "logical and appropriate" and "benefits applicants" like Plaintiff by offering them a holistic means to establish residency. (*Id.* at 10-11.)

C.    **Analysis**

"To satisfy the head of household requirement under the Settlement Act, an applicant must show that he was head of household as of the time he moved from the land partitioned to the other tribe. This element requires establishing when an applicant's residence at a homesite ended." *Barton*, 125 F.4th at 982. "Generally, determining an applicant's residence requires an examination of the person's intent to reside combined with manifestations of that intent. According to the regulations, several factors can be considered, including . . . Ownership of livestock, Ownership of improvements, Grazing Permits, Livestock sales receipts, Homesite leases, Public health records, Medical and Hospital records, including those of Medicinemen, Trading Post records, School records, Military records, Employment records, Mailing Address records, Banking records, Drivers license records, Voting records—tribal and county, Home ownership or rental off the disputed area, BIA Census Data, Information obtained by Certification Field Investigation, Social Security Administration records, Marital records, Court records, Records of Birth, Joint Use Area Roster, any other relevant data." *Id.* at 982-83 (citations omitted). "Furthermore, . . . under the 'temporarily away' exception . . . an applicant who is physically away from their homesite for education or employment can still establish residency for relocation benefits eligibility. Initially, the regulations required an applicant who was 'temporarily away' from their homesite to show 'substantial recurring contacts' with their homesite to establish residency. But since then, the regulations have been

updated to adopt a general 'intent and manifestations of intent' standard instead.  It follows that, consistent with the current regulation, this new standard should also be used to assess the residency of applicants who are 'temporarily away' from their home."  *Id.* at 983 (cleaned up).

Applying these standards, the IHO's determination that Plaintiff was not a resident on the HPL, but rather her "legal residence was in Crownpoint, New Mexico . . . at the time she received financial aid as an adult (turning 18 in January 1978)" (Doc. 12 at 306), was supported by substantial evidence and not arbitrary and capricious.[5]  Indeed, the IHO identified an array of record-based reasons—including Plaintiff's failure to establish the indicia of residency identified in *Barton*, her inability to quantify the frequency of her trips to Beshbito, her testimony as to "her competing time and travel demands," the "insubstantiality" of her visits, her lack of description of anything she did during her visits, and her overall lack of credibility (Doc. 12 at 314-15)—for that determination, and those reasons are supported by substantial evidence.

For example, in support of the conclusion that Plaintiff's residence was in Crownpoint rather than Beshbito as of her 18th birthday in January 1978, the IHO relied in part on the following exchange during the Hearing:

Q:    Did you spend any time at Beshbito that summer?

A:    I came home when I could, I didn't have transportation of my own so it was very difficult, but when I did come home, I would go out to Beshbito with my mother.

(*Id.* at 185.)

Although Plaintiff argues that the word "home" in this sentence referred to Beshbito (Doc. 22 at 15), it was rational for the IHO to interpret Plaintiff's comment in the manner that OHNIR contends it should be interpreted, *i.e.*, "[t]he 'home' plaintiff refers to here can only be Crownpoint because from Crownpoint Plaintiff would 'go out to Beshbito.'" (Doc.

---

[5]    This conclusion makes it unnecessary to decide whether substantial evidence supports the IHO's alternative determination that Plaintiff's residence was "possibly Albuquerque, New Mexico with her boyfriend" as of January 1978.  (Doc. 12 at 306.)

37 at 10.)  The plausibility of this interpretation is underscored by the fact, which the IHO emphasized, that Plaintiff "lived there [Crownpoint] her entire childhood."  (Doc. 12 at 311.)  Under these circumstances, it was rational for the IHO to interpret Plaintiff's testimony as reflecting a belief that Crownpoint was her "home," which could, in turn, be rationally interpreted as reflecting an intent to reside in Crownpoint, rather than Beshbito, upon the conclusion of her schooling.  *Barton*, 125 F.4th at 982 (one consideration when "determining an applicant's residence" is "an examination of the person's intent to reside").  And even if those interpretations and inferences are debatable, any rational interpretation that supports the IHO's conclusion requires affirmance.  *Thomas*, 278 F.3d at 954; *Webb*, 2024 WL 1756092 at *2.

Furthermore, contrary to Plaintiff's assertion, the IHO did not "completely ignore" her statements that her mother never considered the Crownpoint residence to be her home and that Plaintiff and her mother considered Plaintiff's grandparents' hogan to be their home.  The IHO explicitly referred to Plaintiff's statement that neither she nor her mother considered Crownpoint to be their home.  (Doc. 12 at 296 ["Although [Plaintiff] claimed that she and her parents did not consider the IHS housing in Crownpoint to be their home . . . ."].)[6]  And although the IHO never explicitly rejected Plaintiff's assertion in the 2011 Letter that she considered her grandfather's hogan to be her home, the IHO obviously did not "completely ignore" this assertion because it formed the entire basis for Plaintiff's application for relocation benefits.  The IHO merely concluded that the record evidence, combined with Plaintiff's lack of credibility, suggested that Plaintiff did, in fact, consider Crownpoint (rather than Beshbito) to be the place she intended to reside.

Plaintiff's reliance on *Yazzie* also undercuts another one of her arguments—namely, that the IHO somehow erred by considering certain "indicia" of residency because those indicia do not reflect the economic realities of life on the HPL.  (Doc. 32 at 11-12.).  In

---

[6]    In a related vein, ONHIR does not dispute that Plaintiff's mother considered Beshbito to be home, as it is undisputed that Plaintiff's mother received relocation benefits.  But although Plaintiff's mother's residence was imputed to Plaintiff when she was a minor, once Plaintiff reached adulthood in January 1978, her residency became subject to its own analysis.

fact, *Yazzie* cites Fed. Reg. 22,277-78 as identifying the permissible "indicia" of residency that an IHO may consider in the residency analysis. *Yazzie*, 2024 WL 3183134 at *11. Those are the same indicia the IHO considered here, and the Ninth Circuit has recently confirmed the permissibility of this approach. *Barton*, 125 F.4th at 983 ("[T]he regulations have been updated to adopt a general "intent and manifestations of intent" standard instead. *See* 49 Fed. Reg. 22,277–78 (May 29, 1984). It follows that, consistent with the current regulation, this new standard should also be used to assess the residency of applicants who are 'temporarily away' from their homesite.").

Finally, the decision in *Williams* doesn't compel a different outcome. Plaintiff relies on the following language from *Williams*:

> It is firmly established in ONHIR precedent that a person retains an ancestral legal residence (domicile) until the person takes affirmative action to transfer their legal residence somewhere else. A legal residence is determined based on a variety of factors, including intent, and the totality of circumstances of each application must be considered in assessing a person's domicile. Her legal residence followed the legal residence of her parents, Bennie and Nellie Badane, both of whom were legal residents of Big Mountain, and who were declared by ONHIR to never have moved from there as of December 1984. The family maintained a traditional lifestyle and, although Bennie Badane was employed by the BIA at various schools on the Reservation, he and his family maintained substantial and recurring contact with Big Mountain through regular weekend and summer residence there, all in a hogan that Bennie Badane claimed as his own.

(Doc. 12 at 268-69.)

Plaintiff appears to argue that her case is materially indistinguishable from *Williams* and that the IHO's decision to deny her claim was thus arbitrary and capricious. The Court disagrees. In *Williams*, the IHO found the applicant to be "a credible witness." (*Id.* at 266.) The IHO then considered the applicant's testimony and the facts of that case— including that the applicant's "living situation at that time had not changed . . . and she continued to return to her ancestral hogan at Big Mountain on weekends and during the summers"—and concluded that the applicant had shown "substantial and recurring contacts" with the HPL and that "[b]ased on the totality of circumstances, there is no

evidence in the record of this appeal that applicant intended to foreswear Big Mountain as her legal residence . . . or that she took any action to change her ancestral domicile." (*Id.* at 269-70.)  Here, in contrast, the IHO expressly determined that Plaintiff was not credible and identified several permissible, record-based reasons for concluding that she had failed to maintain "substantial and recurring contacts" with the HPL, including that she considered Crownpoint her "home" and could not describe her visits to the HPL with a persuasive degree of specificity.

Accordingly,

**IT IS ORDERED** that:

1.     Plaintiff's motion for summary judgment (Doc. 22) is **denied**.

2.     ONHIR's cross-motion for summary judgment (Doc. 27) is **granted**.

3.     The Clerk shall enter judgment accordingly and terminate this action.

Dated this 12th day of March, 2025.

_____
Dominic W. Lanza
United States District Judge

- 30 -